125 A.3d 760

IN THE MATTER OF THE ADOPTION OF THE MONROE
TOWNSHIP HOUSING ELEMENT AND FAIR SHARE
PLAN AND IMPLEMENTING ORDINANCES.

Superior Court of New Jersey
Law Division Middlesex County

Decided August 26, 2015.

*Geraldine Callahan,* Deputy Attorney General, for the proposed intervenor, New Jersey Department of Community Affairs (*John Hoffman,* Acting Attorney General, attorney).

*Marguerite M. Schaffer* and *Kathleen Cavanaugh* (*Shain, Schaffer & Rafanello, P.C.,* and *Jerome J. Convery,* attorneys) for the Township of Monroe.

*Adam M. Gordon* and *Kevin D. Walsh* for Fair Share Housing Center, Inc. (*Fair Share Housing Center, Inc.,* attorneys).

WOLFSON, J.S.C.

I. Statement of the Case

The Township of Monroe filed this declaratory judgment action, pursuant to the authorization provided by the Supreme Court of

New Jersey in *In re Adoption of N.J.A.C. 5:96 and 5:97 by N.J. Council on Affordable Housing*, 221 *N.J.* 1, 110 *A.*3d 31 (2015), (hereafter *"Mount Laurel IV"*) seeking a judicial declaration that its housing plan is presumptively valid and, if it is not, to determine what modifications are necessary to bring Monroe into compliance with its constitutional obligation to provide affordable housing.[1]

Before me is a motion filed by the New Jersey Department of Community Affairs ("DCA") seeking leave to intervene and to file a counterclaim, which seeks a full accounting of Monroe's affordable housing trust funds and an order requiring the turnover of these funds to the DCA, based on the Township's purported failure "to spend or commit to spend" those monies within the period prescribed by *N.J.S.A.* 52:27D–329.2(d) and –329.3(b). For the reasons set forth below, the DCA's motion to intervene and file a counterclaim is DENIED.

II. Procedural Posture and Facts

a. The July 2008 Amendments to the Fair Housing Act

In July 2008, the Legislature amended the Fair Housing Act ("FHA") to codify what was otherwise the judicially recognized authority of municipalities to impose affordable housing development fees upon developers and expressly permitted COAH to authorize certain municipalities to collect development fees and payments-in-lieu of construction fees from developers. *N.J.S.A.* 52:27D–329.2, –329.3. To ensure that the funds would actually be used toward the construction of affordable housing and would not be "stockpiled" indefinitely by the municipalities, the amendments to the Act require that a municipality spend or commit to expend the fees/payments-in-lieu within four years of the date of collection. *Id.* Importantly, however, the amendments further provide

---

[1] The Township was granted an initial five-month period of immunity from all exclusionary zoning actions pending the court's adjudication of the Township's compliance, and Fair Share Housing Center, Inc. ("FSHC") was granted leave to intervene.

that a municipality *may not* spend or commit to spend the fund monies unless and until it has obtained COAH's approval of its spending plan. *N.J.S.A.* 52:27D–329.2(a). A municipality that fails to spend or commit to expend its trust fund monies within the four-year period "shall be required by [COAH] to transfer the remaining unspent balance" to the New Jersey Affordable Housing Trust Fund (the "State Fund"). *N.J.S.A.* 52:27D–329.2(d).[2] The Legislature directed COAH to promulgate regulations regarding the establishment, administration, and enforcement of the expenditure of affordable housing development fees by municipalities—i.e., what actions would sufficiently constitute "commitment of funds" by a municipality-which it never accomplished.

Clearly, since the time of the 2008 amendments to the FHA, COAH gradually ceased to operate. In or around March 2012, Governor Chris Christie released the 2013 fiscal budget, which included "an amount not to exceed $200,000,000 of monies received in the 'New Jersey Affordable Housing Trust Fund'" to be deposited in the General Fund as state revenue. FSHC commenced litigation to stop the seizure of the funds, resulting in an Appellate Division decision enjoining "COAH or any other part of the executive branch from engaging in any further attempt to seize affordable housing trust funds," [3] and directing that "the use and disposition of those funds will hereafter be decided, in the first instance, by *Mount Laurel*—designated trial judges." *In re Failure of the Council on Affordable Hous. to Adopt Trust Fund*

---

[2] All monies transferred to the State Fund are to be spent on municipal housing projects and programs, with a priority for projects in those municipalities that had petitioned COAH for substantive certification. *N.J.S.A.* 52:27D–320.

[3] The decision left open a narrow exception to this restriction, permitting "an appropriate body of the State" to apply for forfeiture of the trust funds with regard to municipalities "which have, under any rational interpretation of the relevant statutory terms, failed to commit funds." *In re Council on Affordable Hous.*, 440 *N.J.Super.* 220, 228, n. 10, 112 *A.3d* 595 (App.Div.2015).

*Commitment Regulations,* 440 *N.J.Super.* 220, 225, 112 *A.*3d 595 (App.Div.2015) (*"The Trust Fund Decision "*).[4]

b. Relevant History of Monroe's Affordable
Housing Trust Fund

At all relevant times, Monroe was a "participating" municipality before COAH. On or around December 29, 2008, the Township adopted its Third Round Housing Element and Fair Share Plan as well as its Trust Fund Spending Plan, and submitted both to COAH for substantive certification. As a result of filing its petition, the Township was permitted to continue to impose and collect development fees in accordance with the approved ordinance and applicable regulations. *N.J.S.A.* 52:27D–329.2(a); *N.J.A.C.* 5:97–8.1, –8.3. However, because COAH had not approved Monroe's affordable housing or spending plans, the Township was statutorily prohibited from spending *or* committing to spend the funds collected. *N.J.S.A.* 52:27D–329.2(a) ("A municipality *may not spend or commit to spend* any affordable housing fees, including Statewide non-residential fees collected and deposited into the municipal affordable housing trust fund, *without first obtaining the council's approval* of the expenditure") (emphasis added). COAH never approved Monroe's affordable housing or spending plans, rendering Monroe, under the statute, unauthorized to spend or commit the funds in its affordable housing trust.

In May 2012, apparently in response to the inclusion of municipal affordable housing trust fund monies in the State's 2013 fiscal budget, Monroe passed an ordinance authorizing the Township Council to create an irrevocable affordable housing trust, whereby all collected fees would be held by the Township Council for the

---

[4] The Appellate Division declined to "fill [the] vacuum" (caused by COAH's failure to promulgate regulations to define when trust funds are "committed") by interpreting the critical provisions of the 2008 amendments and imposing their own procedures for ascertaining when funds have been committed, noting that the judiciary is not to resolve disputes in the manner in which administrative agencies may do so, but stated that the courts are required to resolve disputes in their usual manner and address this issue on a case-by-case basis. *Ibid.*

sole purpose of developing affordable housing in accordance with the Township's spending plan. Concurrently, the Township adopted an amendment to its Third Round Housing Element and Fair Share Plan to include a municipality-sponsored project and two new overlay zones and also adopted an amendment to its Affordable Housing Trust Fund Spending Plan. On May 31, 2012, an affordable housing irrevocable trust was executed on behalf of Monroe, and on June 29, 2012, the Township's Council, as trustee, opened two bank accounts at TD Bank and deposited the funds therein.[5]

Notwithstanding COAH's failure to approve the spending plans submitted by Monroe in 2008 (as supplemented in 2012), COAH requested, on July 24, 2012, a "certification" as to the status of Monroe's municipal fund and demanded a turnover thereof. The Township responded by letter dated August 9, 2012, certifying that the funds had been "deposited" in an "irrevocable" trust.

On August 10, 2012, the Supreme Court granted FSHC's application for emergent relief and entered an order restraining COAH from "demanding or receiving affordable housing trust funds," because these requests were being made unilaterally by COAH'S Executive Director without any approval by the COAH board.[6]

On May 1, 2013, COAH determined that the Township had failed to timely commit or expend $10,732,103.58, and demanded the forfeiture and transfer of all unspent affordable housing trust funds that had been collected between July 18, 2008, and March 31, 2009. The Township rejected this demand.

---

[5] The Township posits that despite COAH's failure to define "commitment" of funds, its creation of an irrevocable trust for the sole purpose of advancing and funding affordable housing qualifies as a "commitment" of those funds. While such a dedicated and irrevocable trust may well constitute a "commitment" as contemplated by the FHA, given my denial of DCA's motion to intervene, and file a counterclaim in the pending DJ action seeking an accounting of forfeiture of all funds collected, I need not address this issue.

[6] Ultimately the board members ratified the action taken by COAH's Executive Director.

On June 7, 2013, an "Interim Supplemental Order" was entered by the Appellate Division in the Trust Fund Litigation. That order vacated the May 1, 2013, letters sent by COAH, and afforded all affected municipalities 30 days to respond to COAH's contention that the funds were subject to forfeiture, and at the same time, directed COAH to provide a written explanation for rejecting (or accepting) any municipality's position as to forfeiture of its funds. Instead, in a letter dated June 25, 2013, COAH simply reiterated its prior conclusory allegation that Monroe had "failed to commit" the expenditure of the $10,732,103.58. Two days later, the Township responded by forwarding to COAH supplemental documentation to further buttress its position that the funds had in fact been "committed." Despite the Appellate Division's mandatory directive, COAH, remarkably, refused to respond and never explained why the creation and deposit of funds into an irrevocable trust, did, or did not qualify as a "commitment" of its funds.[7]

### III. Standard of Review

The DCA bases its motion for intervention upon both the Declaratory Judgment Act, *N.J.S.A.* 2A:16–56, and *Rules* 4:33–1 and –2. Under the Declaratory Judgment Act, "all persons having or claiming any interest which would be affected by the

---

[7] Even more inexplicable is COAH's unprecedented failure to adopt any regulations which would put municipalities on notice, in the first instance, as to what types of actions *would* qualify as a valid "commitment" of the funds. Because of the vacuum created by COAH's pattern of inaction and non-compliance, the Appellate Division has directed that the application and disposition of the funds such as those in question should, going forward, be adjudicated by the designated *Mt. Laurel* judges on a case-by-case basis. *See The Trust Fund Decision, supra,* 440 *N.J.Super.* at 225, 112 *A.*3d 595. Nothing in that court's opinion, however, required the resolution the forfeiture issues to be adjudicated within the context of a municipality's declaratory judgment action. Given the Supreme Court's admonition that such constitutional compliance litigation should be expedited, even if the DCA's ability to pursue a forfeiture claim was later vindicated, it would be required to do so via a separate action.

declaration shall be made parties to the [declaratory] proceeding."
*N.J.S.A.* 2A:16–56.[8]

Under *Rule* 4:33–1, "Intervention as of Right," a party is
entitled to intervene as of right if the applicant:

(1) claims an interest relating to the property or transaction which is the subject of
the litigation;

(2) demonstrates that it is so situated that the disposition of the litigation may
impair or impede its ability to protect that interest;

(3) demonstrates that its interest is not adequately represented by existing parties;
and

(4) makes a timely application to intervene.

[*Id.*] [9]

Under *Rule* 4:33–2, "Permissive Intervention," a party may be
permitted to intervene in an action

if the claim or defense and the main action have a question of law or fact in
common. When a party to an action relies for ground of claim or defense upon any
statute or executive order administered by a state or federal governmental agency
or officer, or upon any regulation, order, requirement or agreement issued or made
pursuant to the statute or executive order, the agency or officer upon timely
application may be permitted to intervene in the action. In exercising its discre-
tion the court shall consider whether the intervention will unduly delay or prejudice
the adjudication of the rights of the original parties.

[*Id.*]

IV. The DCA Does Not Satisfy the Criteria for Intervention in
this Action

a. The DCA Has No Legitimate Interest in the Crux of this
Declaratory Action: Monroe's Constitutional Compliance

■ Unquestionably, the DCA has no interest in the constitu-
tional compliance proceedings authorized by the Supreme Court

---

[8] The DCA claims that as the "repository" of the State Fund, it is the
appropriate body to represent the State's "interests" in this declaratory litiga-
tion, a conclusion that has not been disputed here.

[9] *See, e.g., Chesterbrooke Ltd. P'ship v. Planning Bd. of Twp. of Chester,* 237
*N.J.Super.* 118, 124, 567 *A.2d* 221 (App.Div.1989); *Vicendese v. J–Fad, Inc.,* 160
*N.J.Super.* 373, 378–79, 389 *A.2d* 1021 (Ch.1978) (noting that where all criteria
of the *Rule* are met, the court must grant intervention as of right).

*Mt. Laurel IV.* Indeed, the DCA concedes as much. Instead, the DCA seeks to intervene in this action "to ensure that the statutory provisions of *N.J.S.A.* 52:27D-329.2 and -329.3 are enforced ... [because] [t]he Legislature intended to prevent stockpiling of affordable housing trust fund monies by requiring certain actions within four years of collection of funds ... [and] no other party to this litigation is representing this interest[.]"

While the DCA is the agency responsible for the State Fund, the Supreme Court's decision in *Mt. Laurel IV*—empowering specified trial judges to adjudicate municipal compliance with the constitutional mandate to provide affordable housing—demonstrates, unmistakably, its intent to streamline resolution of this narrowly defined issue. In this regard, I see no legitimate basis to permit the DCA to intervene in such an action, especially where it has acknowledged having no interest in the limited issues I have been tasked with adjudicating.

The DCA argues that despite its disinterest in Monroe's constitutional compliance, it should be permitted to intervene in this action because the Township's intention to use the trust fund monies in its affordable housing trust fund through this court's approval of its spending plan "threatens" its ability to litigate the merits of its proposed counterclaim—i.e., its right to seize the funds. While it is true that if this court ultimately approves a spending plan resulting in the actual expenditure of the trust fund monies, the DCA would be prevented from pursuing the transfer of those specifically targeted accounts, it is of no irreparable consequence, since money is fungible and the Township understands and has acknowledged that a later ruling in DCA's favor on this issue would require the Township either to amend its plan to exclude and forfeit any unspent funds, or pay back any monies actually expended, but ultimately determined to belong to the State.

Accordingly, I am satisfied that the DCA cannot satisfy the criteria for intervention, based upon its inability to demonstrate an interest in the subject of this constitutional compliance action, and

its inability to demonstrate that the disposition of this litigation will irreparably impede or impair its rights. Furthermore, the unique posture of this action, as mandated by the Supreme Court in *Mount Laurel IV*, requires that I limit the scope of this declaratory action to its intended purpose: determining whether the Township of Monroe has fulfilled its obligation to provide affordable housing. For these reasons, I am satisfied that the DCA's intervention in this declaratory action is improper.

V. Even if the DCA was Permitted to Intervene in this Action, its Counterclaim Seeking a Transfer of Municipal Trust Fund Monies Would Be Futile

Assuming, *arguendo*, that the DCA was otherwise entitled to intervene and to file a counterclaim seeking the forfeiture of Monroe's trust funds, its request to intervene for such a purpose would be rejected on grounds that it would be futile, as a matter of law on at least, two separate grounds.[10] First, the four-year period, within which Monroe was, by statute, required to obtain COAH's approval, before "spending" or "committing to spend" the funds, cannot reasonably be interpreted to have been "triggered," in light of COAH's utter failure to carry out its regulatory responsibilities. Second, even if I were to determine that Monroe *should* have "committed" the funds (despite the unequivocal statutory prohibition against doing so prior to obtain-

---

[10] DCA's application for leave to file a counterclaim is no different than an attempt to amend a pleading to add or supplement a counterclaim where courts examine the pleadings "to determine whether it is futile," i.e., whether the claim will nonetheless fail and, hence, allowing the pleading "would be a useless endeavor." *Notte v. Merchs. Mut. Ins. Co.*, 185 N.J. 490, 501, 888 A.2d 464 (2006). "The determination must be made 'in light of the factual situation existing at the time each motion is made.'" *Ibid.* (quoting *Fisher v. Yates*, 270 N.J.Super. 458, 467, 637 A.2d 546 (App.Div.1994)). Courts are empowered to refuse leave "when the newly asserted claim is not sustainable as a matter of law." There is no point to permitting the filing of a pleading "when a subsequent motion to dismiss must be granted." *Interchange State Bank v. Rinaldi*, 303 N.J.Super. 239, 256–57, 696 A.2d 744 (App.Div.1997) (citing *Mustilli v. Mustilli*, 287 N.J.Super. 605, 607, 671 A.2d 650 (Ch.Div.1995)).

ing COAH's approval), COAH's failure to define "commitment," and COAH's inexplicable failure to review, reject or approve, Monroe's submissions, preclude and estop the DCA, both legally and equitably, from now claiming a forfeiture of those funds.

a. COAH's Failure to Function Results in a Tolling of the
Four-Year Period Within Which Monroe was Required
to Commit its Affordable Housing Trust Funds

■ In analyzing the statutory provision at issue, *N.J.S.A.* 52:27D–329, I am guided by well-established principles of statutory construction. The most important factor in construing a statute "is generally considered to be the intent of the Legislature, if it can be discerned." [11] The words of a statute must be given their common-sense meaning in the context of the entire statute, which should be afforded a "harmonizing construction and read so as to give effect to all of its provisions and to the legislative will." [12] Statutes must, if reasonably possible, be accorded a construction that is sensible and consonant with reason and good discretion, rather than one that leads to absurd consequences. *Schierstead v. Brigantine*, 29 *N.J.* 220, 230, 148 *A.2d* 591 (1959); *see also Manchester Twp. Bd. of Educ. v. Raubinger*, 78 *N.J.Super.* 90, 187

---

[11] *State v. Tischio*, 107 *N.J.* 504, 510, 527 A.2d 388 (1987); *see also City of Newark v. County of Essex*, 160 *N.J.Super.* 105, 113, 388 A.2d 1311 (App.Div. 1978), (in construing a statute, the court must consider the legislative purpose) *aff'd*, 80 *N.J.* 143, 402 A.2d 916 (1979); *Headen v. Jersey City Bd. of Educ.*, 212 *N.J.* 437, 448, 55 A.3d 65 (2013).

[12] *State v. Channel Home Ctrs.*, 199 *N.J.Super.* 483, 489, 489 A.2d 1225 (App.Div.1985); *see also Horwitz v. Reichenstein*, 15 *N.J.* 6, 8, 103 A.2d 881 (1954) (where a statute is ambiguous, it is the duty of the judiciary to choose that construction which will carry out the legislative intent of the statute as a whole); *Beard v. Aldrich*, 106 *N.J.L.* 266, 149 A. 57 (Sup.Ct.1930) (courts must adopt that construction of a statute which reconciles and gives reasonable meaning to all its provisions); *Cressey v. Campus Chefs, Div. of CVI Serv., Inc.*, 204 *N.J.Super.* 337, 342–43, 498 A.2d 1274 (App.Div.1985) (the judiciary is obligated "to respect the legislative intention by interpreting the statute in a common-sense manner which advances the legislative purpose.")

*A.*2d 614 (App.Div.1963) (statutes should not be interpreted so as to produce an absurd or anomalous result).

*N.J.S.A.* 52:27D–329.2(a) unambiguously provides that "a municipality *may not* spend or commit to spend any affordable housing development fees ... without first obtaining [COAH's] approval of the expenditure." *Id.* (emphasis added). Not only did COAH fail to define what municipal actions would suffice as a "commitment" of funds,[13] but it never even responded to municipalities that *had* submitted spending plans for approval, such as Monroe, leaving them wholly immobilized with respect to the use of their affordable housing funds.[14] To suggest that a municipality, such as Monroe Township—that was lawfully barred from spending or committing its fund monies unless and until COAH approved the specific request to spend or commit—should now be required to forfeit over $10 million because of that entity's inaction, is a "Catch 22" of the most rudimentary sort.[15]

In providing that "all fees shall be committed for expenditure within four years from the date of collection," the Legislature's clear intent was to preclude municipalities from accumulating funds indefinitely, never using them toward the construction of affordable housing.[16] However, its overarching concern, that uncommitted funds would escheat to the State, could not reasonably

---

[13] *See The Trust Fund Decision, supra,* 440 *N.J.Super.* at 222, 112 *A.*3d 595.

[14] COAH appears to have approved only two municipal spending plans since July 2012, despite having hundreds of spending plans before it for review and approval, which approvals materialized only after litigation had been filed. *See The Trust Fund Decision, supra,* 440 *N.J.Super.* at 225, n. 8, 112 *A.*3d 595.

[15] Indeed, the Appellate Division pointedly acknowledged this dilemma in its Trust Fund Decision. *See The Trust Fund Decision, supra,* 440 *N.J.Super.* at 225, 112 *A.*3d 595 ("The simple fact is that COAH has ignored the considered wisdom of our Legislature by failing to promulgate rules.... COAH has not acted as required by the Legislature, and the parties have been placed in a most uncertain position with respect to these funds.")

[16] *See Public Hearing before Assembly Hous. & Local Gov't Comm.,* 213th Legis., Dec. 10, 2007 at 4 (Statement of Speaker Joseph J. Roberts, Jr.).

have been intended to punish municipalities that sought, in good faith, to utilize those trust funds for their intended purposes—advancing affordable housing—but were stymied either by COAH's impotence or its unwillingness to act. Indeed, whether calculated or not, the resultant dismantling of COAH and its ultimate collapse could not reasonably have been foreseen by the Legislature and was, for all intents and purposes, without precedent in the annals of New Jersey administrative law. Had the contrary been so, the Legislature would certainly (and easily could) have included some alternative process or means, such as resort to the courts, through which a municipality could seek to use its affordable housing funds and implement its housing element and fair share plan.

The statutory mandate that a municipality obtain COAH's "approval" before being allowed in the first instance, either to spend or to "commit" to spend certain funds, quite obviously rests upon the rather unremarkable assumption that COAH would continue to be a normally functioning State Administrative Agency, and that its review and approval (or rejection) of matters within its jurisdiction, would be mundane and routine. Given the apparent fallacy of this assumption, it would be jarringly anomalous (not only with regard to general rules of statutory construction, but also in light of common sense) to penalize a municipality because it could not obtain approval from an agency that either purposely refused, or was simply unwilling or unable, to carry out its statutory duties and obligations. If municipalities are to be limited to a specific time period within which they must commit to spend certain monies, they must, of necessity, also be given a reasonable and practical avenue by which to do so.[17]

---

[17] It is also of note that *N.J.A.C.* 5:97–8.13(b) affords a municipality an *"opportunity to cure"* any alleged deficiency in its expenditure requests *prior to the State's seizure* of those affordable housing trust funds. ("[COAH] shall notify the municipality ... that such a condition has occurred and direct the municipality to remedy the condition.") There is no dispute that this "opportunity to cure" was never afforded to, nor availed by the Township, a fundamental violation by DCA of its own regulations that is, itself, fatal to its claim to

Consequently, I must strive to reconcile these seemingly incompatible and contradictory statutory provisions so as to give effect to the Legislature's dual overarching goals: (1) to prevent the stockpiling of affordable housing trust funds on the one hand; and (2) to insist upon some review and oversight of the spending plans on the other, so as to ensure that the collected funds are in fact, utilized for their intended purposes of creating and providing affordable housing opportunities.

In this regard, it is helpful to examine the manner in which the Supreme Court interpreted various provisions of the Fair Housing Act in the context of municipal requests to "transfer" their pending *Mount Laurel* lawsuits from the courts to the newly created Council on Affordable Housing. *See Hills Dev. Co. v. Bernards,* 103 *N.J.* 1, 510 *A.*2d 621 (1986). There, despite the absence of any statutory provision compelling [18] municipalities to seek substantive certification following a "successful transfer," the Court recognized that if such "transferred" municipalities could indefinitely delay petitioning COAH for substantive certification or worse, could withdraw from the process after having participated at length, the legislative intent of encouraging agency review and approval instead of continued judicial oversight would be severely undermined. *Id.* at 33, 510 *A.*2d 621. To reconcile the apparent omission, and to avoid the mischief that could easily result from such conduct, the court "deemed" the municipal motions to transfer to be tantamount to a voluntary petition for substantive certification. *Id.* at 57, n. 19, 510 *A.*2d 621.

So too, here, Monroe Township's affirmative step in filing a declaratory judgment action to obtain judicial approval of its

---

Monroe's trust funds and which further demonstrates the futility of its proposed counterclaim. While DCA maintains that this provision is not applicable to a municipality's "failure" to comply with *N.J.S.A.* 52:27D–329.2, I am unpersuaded. Monroe should not forfeit a right to cure any perceived deficiencies in its proposed spending plan because of COAH's inaction.

[18] *See N.J.S.A.* 52:27D–313 ("A municipality which has filed a housing element *may* ... petition the council for a substantive certification" (emphasis supplied)).

housing element and fair share plan (which depends at least in part, on approval of its proposed trust fund expenditures), shall, likewise, be "deemed" the legal and equitable equivalent [19] to having requested COAH's approval of its spending plan, thereby satisfying, in my view, its statutory obligation in this regard.

Accordingly, the filing of the declaratory judgment action will "trigger" the start of the four-year clock contemplated by *N.J.S.A.* 52:27D–329.2(d). However, for those towns proceeding in good faith toward achieving constitutional compliance, the time period within which to "spend or commit to spend" the trust funds, will be "tolled" until such time as the court has either: (1) granted a judgment of compliance; or (2) adjudicated a municipality's fair share plan to be deficient; and has, in addition, concluded (3) that the municipality is "determined to be non-compliant" by failing to amend or correct its plan's deficiencies.

 Where a judgment of compliance *is* ultimately awarded to a municipality whose fair share compliance package included an approved trust fund spending plan, that judgment shall be sufficient to satisfy the prerequisites of *N.J.S.A.* 52:27D–329.2(a), that no affordable housing trust fund monies be spent without prior review and approval. In such a case, the time period within which to "spend or commit to spend" will begin to run from the filing date of the judgment of compliance. In the latter case, where a municipality is determined to be non-compliant, the tolling will cease simultaneously with the entry of that judgment, and the four-year period will relate back to, and be calculated from the filing date of the original declaratory judgment action, although any future forfeiture proceedings must be brought in a separate, independent action, consistent with the Appellate Division's deci-

---

[19] While the Supreme Court cautioned that the judicial role "is not to become a replacement agency for COAH," the designated *Mount Laurel* judges were encouraged to "track" the process provided for in the Fair Housing Act "as closely as possible." *See Mount Laurel IV, supra,* 221 *N.J.* at 6, 29, 110 *A.*3d 31.

sion in *The Trust Fund Decision,* and in accordance with all applicable statutory provisions and protocols.[20]

VI. Conclusion

For the reasons set forth above, I am satisfied that the DCA is procedurally, legally, and equitably precluded from intervening in this action, not only because of the Supreme Court's clear directive that declaratory judgment actions such as that filed by Monroe Township sub judice, are limited to the issue of constitutional compliance, but also because intervention by DCA to pursue its proposed counterclaim would be futile, and would, as a matter of law, be dismissed. As a result of COAH's abject failure to function and the consequent inability of any municipality to obtain COAH approval of its spending plan, those equitable and legal principles demand that the statutory four-year time period (during which collected trust funds were required to be spent or "committed") be tolled, and the running of the period within which to commit said funds, not be triggered until a municipality's housing element and fair share plan is either adjudicated to be constitutionally compliant, or its plan is judicially rejected and the court concludes that the municipality is determined to be non-compliant.

This conclusion fairly reconciles and harmonizes the applicable statutory language so as to avoid an absurd or anomalous result, and properly affords deferential respect to the Legislature's primary intent and dual purposes of: (1) discouraging the stockpiling of affordable housing funds; and (2) insuring that there be independent oversight of municipal efforts to utilize those collected trust funds. In so doing, the trust funds of participating municipalities that achieve constitutional compliance, are preserved,

---

[20] *See The Trust Fund Decision, supra,* 440 *N.J.Super.* at 228, n. 10, 112 *A.*3d 595 where the Court explained: "Our injunction [against seizing the Affordable Housing Trust Funds] by no means forbids an appropriate body of the State from applying to the courts for forfeiture of trust fund with regard to municipalities which have, under any rational interpretation of the relevant statutory terms, failed to commit funds."

while recalcitrant and non-compliant municipalities will be left vulnerable to separate, subsequent challenges by the DCA in any future pursuits to seize unspent affordable housing funds.

An appropriate form of order, incorporating this opinion by reference, has been entered simultaneously herewith. No costs.